1

2

3

4

5

6

7

8                         IN THE UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LORETO PARADELA,

11             Petitioner,                    2: 07 - cv - 2757 - JAM TJB

12        vs.

13   R. SUBIA, Warden,

14             Respondent.            FINDINGS AND RECOMMENDATIONS

15   _____/

16                              I. INTRODUCTION

17        Petitioner, Loreto Paradela is a state prisoner proceeding *pro se* with a petition for writ of

18   habeas corpus brought pursuant to 28 U.S.C. § 2254. Petitioner is currently serving a sentence of

19   fifteen years to life imprisonment following his 1994 conviction for second degree murder.

20   Petitioner challenges the October 10, 2006 decision of Governor Schwarzenegger reversing a

21   grant of parole by the Board of Parole Hearings ("Board"). Petitioner presents a single claim for

22   review; specifically that the Governor's decision and the California state court's subsequent

23   review of that decision violated his "federal due process rights and did not comport with clearly

24   established federal law, in that the decisions was contrary to, and an unreasonable application of,

25   federal law and resulted in decisions that were unreasonable based on the facts presented."

26   (Pet'r's Pet. at p. 4.) Based on a thorough review of the record and the applicable law, it is

1

1  recommended that the Petition be denied.

2  ## II. FACTUAL AND PROCEDURAL BACKGROUND[1]

3  Early in the morning of September 5, 1993, Loreto Paradela drove
   his motorcycle to Robert Bracamonte's house, where Mr. Paradela
4  and others planned to party. Some time later, as the group was
   leaving, Mr. Bracamonte asked to ride Mr. Paradela's motorcycle,
5  and Mr. Paradela agreed. Thomas Lagua, Mr. Paradela's friend,
   drove Mr. Paradela to Mr. Lagua's house while Mr. Bracamonte
6  followed on motorcycle. At one point during the drive, Mr.
   Bracamonte unexpectedly "disappeared" for approximately 30
7  minutes to an hour, upsetting Mr. Paradela. Mr. Bracamonte and
   Mr. Paradela later met up at Mr. Lagua's house. Mr. Lagua then
8  drove Mr. Paradela and Mr. Bracamonte back to Mr. Bracamonte's
   house.

9
   Along the way, Mr. Lagua stopped the car in a field to allow Mr.
10  Paradela to urinate. When Mr. Paradela returned to the car, he
    pulled Mr. Bracamonte out of the car to fight. Mr. Paradela
11  punched Mr. Bracamonte and then took out a knife and stabbed
    him approximately three times. Mr. Bracamonte ran into the field
12  to get away from Mr. Paradela, but Mr. Paradela chased him down
    and continued stabbing him. Mr. Paradela then returned to the car
13  and they drove away leaving Mr. Bracamonte in the field to die.

14  (Resp't's Answer, Ex. 1 at p. 84.)

15  Petitioner was convicted of second degree murder in 1994 and was sentenced to fifteen

16  years to life imprisonment. On May 17, 2006, the Board conducted a subsequent hearing to

17  determine Petitioner's suitability for parole. The Board determined that Petitioner would not

18  pose an unreasonable risk of danger to society or a threat to public safety if released and thus

19  concluded that he was suitable for parole.

20  On October 10, 2006, Governor Schwarzenegger reversed the Board's grant of parole.

21  Petitioner challenged the Governor's reversal in the San Joaquin County Superior Court. That

22  court denied his petition on March 12, 2007. The California Court of Appeal, Third District and

23  the California Supreme Court denied Petitioner's state habeas petition without written opinions.

24

25      [1] The factual background of the underlying criminal offense is taken from the Governor's
    October 10, 2006 decision reversing the Board's decision which had granted Petitioner parole.
26  (See Resp't's Answer, Ex. 1 at p. 84-86.)

2

1       III. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

2           An application for writ of habeas corpus by a person in custody under judgment of a state

3   court can only be granted for violations of the Constitution or laws of the United States. See 28

4   U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v.

5   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

6   Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

7   and Effective Death Penalty Act of 1996 ("AEDPA") applies. See Lindh v. Murphy, 521 U.S.

8   320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim

9   decided on the merits in the state court proceedings unless the state court's adjudication of the

10  claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

11  clearly established federal law, as determined by the Supreme Court of the United States; or (2)

12  resulted in a decision that was based on an unreasonable determination of the facts in light of the

13  evidence presented in state court. See 28 U.S.C. 2254(d).

14          As a threshold matter, this Court must "first decide what constitutes 'clearly established

15  Federal law, as determined by the Supreme Court of the United States.'" Lockyer v. Andrande,

16  538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law'

17  under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court

18  at the time the state court renders its decision.'" Id. This Court must consider whether the state

19  court's decision was "contrary to, or involved an unreasonable application of, clearly established

20  Federal law." Lockyer, 538 U.S. at 72. Under the unreasonable application clause, a federal

21  habeas court making the unreasonable application inquiry should ask whether the state court's

22  application of clearly established federal law was "objectively unreasonable." See Williams v.

23  Taylor, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue the writ simply because

24  the court concludes in its independent judgment that the relevant state court decision applied

25  clearly established federal law erroneously or incorrectly. Rather, that application must also be

26  unreasonable." Id. at 411. Although only Supreme Court law is binding on the states, Ninth

1   Circuit precedent remains relevant persuasive authority in determining whether a state court
2   decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003)
3   ("While only the Supreme Court's precedents are binding . . . and only those precedents need be
4   reasonably applied, we may look for guidance to circuit precedents.").

5        The first step in applying AEDPA's standards is to "identify the state court decision that
6   is appropriate for our review." See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).
7   When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the
8   last reasoned decision. Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). In this case,
9   the last reasoned state court opinion was from the San Joaquin Superior Court.

10                                IV. DISCUSSION

11       The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives
12  a person of life, liberty, or property without due process of law. A person alleging a due process
13  violation must first demonstrate that he or she was deprived of a protected liberty or property
14  interest, and then show that the procedures attendant upon the deprivation were not
15  constitutionally sufficient. See Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 459-60 (1989).

16       A protected liberty interest may arise either from the Due Process Clause itself or from
17  state laws. See, e.g., Bd. of Pardons v. Allen, 482 U.S. 369, 373 (1987). The United States
18  Constitution does not, in and of itself, create a protected liberty interest in the receipt of a parole
19  date. See Jago v. Van Curen, 454 U.S. 14, 17-21 (1981). However, if a state's statutory parole
20  scheme uses mandatory language, it "creates a presumption that parole release will be granted"
21  when or unless certain designated findings are made, thereby giving rise to a constitutional
22  liberty interest. McQuillian v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002) (quoting Greenholtz v.
23  Inmates of Neb. Penal and Corr. Complex, 442 U.S. 1, 12 (1979)).

24       The full panoply of rights afforded a defendant in a criminal proceeding is not
25  constitutionally mandated in the context of a parole proceeding. See Pedro v. Or. Parole Bd., 825
26  F.2d 1396, 1398-99 (9th Cir. 1987). The Supreme Court has held that a parole board's

                                        4

1 procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a
2 decision informing him of the reasons he did not qualify for parole. <u>See</u> <u>Greenholtz</u>, 442 U.S. at
3 16.

4 Additionally, as a matter of state law, denial of parole to California inmates must be
5 supported by at least "some evidence" demonstrating current dangerousness. <u>See Hayward v.</u>
6 <u>Marshall</u>, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc) (citing <u>In re Rosenkrantz</u>, 29 Cal. 4th
7 616, 128 Cal. Rptr. 2d 104, 59 P.3d 174 (2002); <u>In re Lawrence</u>, 44 Cal. 4th 1181, 82 Cal. Rptr.
8 3d 169, 190 P.3d 535 (2008); <u>In re Shaputis</u>, 44 Cal. 4th 1241, 82 Cal. Rptr. 3d 213, 190 P.3d
9 573 (2008)). "California's 'some evidence' requirement is a component of the liberty interest
10 created by the parole system of the state." <u>Cooke v. Solis</u>, 606 F.3d 1206, 1213 (9th Cir. 2010)
11 (per curiam). Thus, a reviewing court such as this one must "decide whether the California
12 judicial decision approving the governor's decision rejecting parole was an 'unreasonable
13 application' of the California 'some evidence' requirement or was it 'based on an unreasonable
14 determination of the facts in light of the evidence.'"[2] <u>Hayward</u>, 603 F.3d at 562-63.

15 The analysis of whether some evidence supports denial of parole to a California state
16 inmate is framed by the state's statutes and regulations governing parole suitability
17 determinations. <u>See</u> <u>Irons v. Carey</u>, 505 F.3d 846, 851 (9th Cir. 2007), <u>overruled in part on other</u>
18 <u>grounds</u>, <u>Hayward</u>, 603 F.3d 546. This court "must look to California law to determine the
19 findings that are necessary to deem a prisoner unsuitable for parole, and then must review the
20 record to determine whether the state court decision holding that these findings were supported
21 by 'some evidence' . . . constituted an unreasonable application of the 'some evidence'

22

23     [2] To the extent that the Respondent argues that Petitioner's claim is not cognizable on
federal habeas review under AEDPA or that Petitioner does not have a federally protected
24 interest in parole, the Ninth Circuit has specifically held that "due process challenges to
California courts' application of the 'some evidence' requirement are cognizable on federal
25 habeas review under AEDPA," and that "California's 'some evidence" requirement is a
component of the liberty interest created by the parole system of that state." <u>Cooke,</u> 606 F.3d at
26 1213 (citing <u>Hayward,</u> 603 F.3d at 561-64).

1 | principle." Id.

2 | California Penal Code section 3041 sets forth the state's legislative standards for

3 | determining parole for life-sentenced prisoners. Section 3041(a) provides that, ""[o]ne year prior

4 | to the inmate's minimum eligible release date a panel . . . shall again meet with the inmate and

5 | shall normally set a parole release date." Cal. Penal Code § 3041(a). However, subsection (b)

6 | states an exception to the regular and early setting of a lifer's term, if the Board determines "that

7 | the gravity of the current convicted offense or offenses, or the timing and gravity of current or

8 | past convicted offense or offenses, is such that the consideration of public safety requires a more

9 | lengthy period of incarceration for this individual." Cal. Penal Code § 3041(b).

10 | Title 15, Section 2402 of the California Code of Regulations sets forth various factors to

11 | be considered by the Board in its parole suitability findings for murderers. "The regulation is

12 | designed to guide the Board's assessment of whether the inmate poses 'an unreasonable risk of

13 | danger to society if released from prison,' and thus whether he or she is suitable for parole." In

14 | re Lawrence, 44 Cal. 4th at 1214, 82 Cal. Rptr. 3d 169, 190 P.3d 535. The Board is directed to

15 | consider all relevant, reliable information available regarding:

16 |
17 |
18 |
19 |
20 |

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

21 | 15 Cal. Code Regs. § 2402(b). The regulation also lists several specific circumstances which

22 | tend to show suitability or unsuitability for parole. Id. § 2402(c)-(d).[3] The overriding concern is

23 |

24 | [3] Circumstances tending to indicate unsuitability include:

25 |
26 |

> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
> (A) Multiple victims were attacked, injured or killed in the same or

6

1    public safety and the focus is on the inmate's *current* dangerousness.  See In re Lawrence, 44

2    ————————————————————

3               separate incidents.
          (B) The offense was carried out in a dispassionate and calculated manner,
          such as an execution style murder.
4         (C) The victim was abused, defiled or mutilated during or after the
          offense.
5         (D) The offense was carried out in a manner which demonstrates an
          exceptionally callous disregard for human suffering.
6         (E) The motive for the crime is inexplicable or very trivial in relation to
          the offense.
7     (2) Previous Record of Violence.  The prisoner on previous occasions inflicted or
     attempted to inflict serious injury on a victim, particularly if the prisoner
8    demonstrated serious assaultive behavior at an early age.
     (3) Unstable social history.  The prisoner has a history of unstable or tumultuous
9    relationships with others.
     (4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted
10   another in a manner calculated to inflict unusual pain or fear upon the victim.
     (5) Psychological Factors.  The prisoner has a lengthy history of severe mental
11   problems related to the offense.
     (6) Institutional Behavior.  The prisoner has engaged in serious misconduct in
12   prison or jail.

13   15 Cal. Code Regs. § 2402(c).

14        Circumstances tending to indicate suitability include:

15        (1) No Juvenile Record.  The prisoner does not have a record of assaulting others
          as a juvenile or committing crimes with a potential of personal harm to victims.
16        (2) Stable Social History.  The prisoner has experienced reasonably stable
          relationships with others.
17        (3) Signs of Remorse.  The prisoner performed acts which tend to indicate the
          presence of remorse, such as attempting to repair the damage, seeking help for or
18        relieving the suffering of the victim, or indicating that he understands the nature
          and magnitude of the offense.
19        (4) Motivation for Crime.  The prisoner committed his crime as the result of
          significant stress in his life, especially if the stress has built over a long period of
20        time.
          (5) Battered Woman Syndrome.  At the time of the commission of the crime, the
21        prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b),
          and it appears the criminal behavior was the result of that victimization.
22        (6) Lack of Criminal History.  The prisoner lacks any significant history of violent
          crime.
23        (7) Age.  The prisoner's present age reduces the probability of recidivism.
          (8) Understanding and Plans for Future.  The prisoner has made realistic plans for
24        release or has developed marketable skills that can be put to use upon release.
          (9) Institutional Behavior.  Institutional activities indicate an enhanced ability to
25        function within the law upon release.

26   Id. § 2402(d).

7

1   Cal. 4th at 1205, 82 Cal. Rptr. 3d 169, 190 P.3d 535.  Thus, the proper articulation of the

2   standard of review is not whether some evidence supports the reasons cited for denying parole,

3   but whether some evidence indicates that the inmate's release would unreasonably endanger

4   public safety.  See In re Shaputis, 44 Cal. 4th at 1254, 82 Cal. Rptr. 3d 213, 190 P.3d 573.  There

5   must be a nexus between the facts relied upon and the ultimate conclusion that the prisoner

6   continues to be a threat to public safety.  In re Lawrence, 44 Cal. 4th at 1227, 82 Cal. Rptr. 3d

7   169, 190 P.3d 535.  As to the circumstances of the commitment offense, the Lawrence court

8   concluded that while:

9            the Board and the Governor may rely upon the aggravated
             circumstances of the commitment offense as a basis for a decision
10           denying parole, the aggravated nature of the crime does not in and
             of itself provide some evidence of current dangerousness to the
11           public unless the record also establishes that something in the
             prisoner's pre- or post-incarceration history, or his current
12           demeanor or mental state, indicates that the implications regarding
             the prisoner's dangerousness that derive from his or her
13           commission of the commitment offense remain probative to the
             statutory determination of a continuing threat to public safety.

14

15   Id. at 1214, 82 Cal. Rptr. 3d 169, 190 P.3d 535.

16       A.      2006 Board Decision

17           The panel of the Board that presided over Petitioner's 2006 hearing considered the factors

18   bearing on Petitioner's suitability for parole and weighed those factors in favor of releasing him

19   on parole.

20           The Board stated the following in deciding to grant Petitioner parole:

21               The Panel reviewed all information received from the public and
                 relied on the following circumstances in concluding that you are
22               suitable for parole and would not pose an unreasonable risk of
                 danger to society or a threat to public safety if released from
23               prison.  The prisoner has no juvenile record of assaulting others.
                 While in prison, he has enhanced his ability to function within the
24               law upon release through participation in educational programs,
                 self-help and therapy, vocational programs, and institutional job
25               assignments.  I will go into more detail here.  First of all, the Panel
                 appreciated your frank testimony today about what you have done,
26               even though you didn't get caught, in your prior history.  You said

                                                8

that in an unsolicited manner, and you said it very honestly and openly. You admit to being an addict. You've admitted to both drugs and alcohol. And you appear to have been - have served now thirteen years drug free, and we'll be talking a little more act [sic] the fact that you are also disciplinary free. I would like to mention that you were, at least being courted for membership in the gang BMG, but we have in the C file information indicating that you were not a recalcitrant gang member, and in fact, there is nothing in your file that shows you have acted in any way in a gang capacity on the inside during your period of indication. As to your institutional behavior, you have programmed commendably. First of all, and this is very important, you have had no disciplinary violations, either 115s or 128(s)s in prison and that's very impressive, sir, especially with your prior gang affiliation. We know for a fact how hard that is to achieve. As to your education, you did achieve your GED in September 9th of 1996. You also are to be commended for the taking a typing test, which put you on the clerk's list. Your placement score, otherwise known as classification score, is now 19, which is basically a zero for lifers. It's the lowest that you can achieve which is good. And of course, it's typically needed for us to even consider you for a grant. As to your vocations, it's impressive in the time that you've been here you have achieved not one but two vocations. The first, as we look into the record, for vocation in welding, and that was achieved in August 7th of 2002. A second vocation in mill and cabinetry, December 21st of 2004. As to your prison work, you're now assigned as a draftsman for vocational mill and cabinetry in a class in which you are training other students on their designing and fabricating projects. I'd like at this time to say that we did discover a couple other thing [sic] in terms of your achievements. You're not a man that speaks loudly of your achievements. You're very modest, and so we were looking for all of your achievements. We found that you have participated in a Christian 12 step, that's NA/AA recovery program in 2005, and you've had long participation in AA/NA. You've had courses in anger management, which we feel you've demonstrated today in all of your discussions, and your demeanor demonstrates that you have, not only taken control of yourself, but we don't see evidence that you have underlying anger that would manifest itself potentially in violence on the outside. We also are taking into account that you've been involved in criminal and gangs anonymous program. You were also a volunteer tutor and received a laudatory chrono in March 18th of 1996 for that, which you did not mention here today. You've also been a volunteer in the lifer's forum, and you participated in the victim's workshop in 2003.

This panel finds that your offense was committed as a result of significant stress in your life, and I should mention this is long-standing stress created primarily by the only role model you had, that was your father, and the havoc that he was creating for your family, such that it was difficult or impossible for you to remain at

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

home, and that obviously, generated a lot of the stress in your life. But you again, you have not – you have taken responsibility in a sincerely remorseful way in front of this Panel, and you have not attributed your crime to anyone but yourself. Because of your maturity, growth, and greater understanding in your advanced age, you have a reduced probability of recidivism, but I should mention here that you're not an old man. You're still a young man. And you have lots of potential for further growth, and I believe that you have further potential to go out and become a useful productive citizen in your society, and this is the type of individual that we want to see be granted parole. We feel that you have realistic parole plans, which include a job offer and family support, and that's been documented. We have the documents here today and they've been read into the record. You have maintained close family ties while in prison via letters and/or visit. And you mentioned that had you had reconciled with your father before he passed, and you said that in a way that made us understand that you have had a great deal of understanding into your own relationship with your father, as well as your entire family. You've recently maintained positive institutional behavior that indicates significant improvement in self control, but again I would like to stress for the Boards that will be reviewing this decision and who won't have the advantage of having you in front of us, them, that you have done this, maintaining control, not in a way that appears to be inducing stress in you, but it is in a very positive way. It appears you have become a very mature man . . . .

You have shown signs of remorse to this Panel, and you've actually shown a very deep insight by some of your remarks. You've indicated that you understand the nature and magnitude of this offense. You do accept responsibility for the criminal behavior, and not just by words but . . . by actually your deeds. It's more important to this Panel that we see deeds and not – and regardless of words, we're going to be looking at the deeds. So your words were there, but your deeds were certainly supporting those words. Let's see, we mentioned that the parole plans appear to be valid. The confidential information in the C file is clear. Again, I'd like to reiterate that there is no information of gang involvement after incarceration. Again, you've been disciplinary free throughout your tenure, and it was also impressive to this Panel, and we note for the record that you contacted - you, the inmate, contacted the detective to make a full confession and unburden your substantial sense of guilty, and that's a direct quote from the Probation Officer's Report, so from the very beginning you appear to have understanding of what was involved in your crime.

As to the psychiatric/psychological factors . . . First, we'll reference the report of February 26th, 2002. . . . It appears favorable and appears to support release. Dr. Inaba assessed you as having antisocial behavior by history, no diagnosis on access two.

10

1
2
3
4
5
6
7
8
9
10
11

Access three, migraine headaches, minor sports injuries. Access four, psychosocial stressors, of course, incarceration. Access five, and then she gave, and then she gave you a global assessment of functioning, a GAF score of 85, which is high. And to quote the psychologist, "in an institutional environment, Mr. Paradela would seem to represent no danger of violent behavior. He also uses his time in prison constructively to increase his employment skills and to engage in self-help activities. He has a clean institutional disciplinary record. Comments in file suggests he gets along extremely well with staff and other inmates." Again, quoting, "Mr. Paradela has shown an impressive ability to adapt to incarceration in a positive manner. Mr. Paradela's expressions of remorse also seem to be genuine and he's capable of empathy toward the victim and the victim's families . . . this evaluation produced no factors that would indicate Mr. Paradela is unsuitable for parole consideration. He has shown unusual strengths in the area of attitude, coping skills, personality factors, social supports, adjust to institutional life, and remorse. In an institutional setting he has demonstrated the ability to make positive personal change and consistently positive decision."

12
13
14
15
16
17

As to the second psychological report . . . dated December 8th, 2005 . . . Dr. Weber assesses you on access one, psychological dependence in institutional remission[4], cannabis abuse in institutional remission. Access two, no diagnosis. Access three, non-contributory. Access four, incarcerated. Access five, a current GAF, global assessment of functioning of 85. And I quote from Dr. Weber's report, "Mr. Paradela has never received a 115. This indicates that he has learned to effectively control his behavior. He has maintained strong family bonds throughout his years of incarceration. This serves as a protective factor against reoffending . . .

18
19
20
21
22
23
24

[T]he Panel has observed that it has taken some initiative and proactive work on your part to maintain that bond. It obviously did not come easily to you to maintain a bond with your family, as dysfunctional as it was. Returning to the quote of Dr. Weber, "Mr Paradela takes full responsibility for his actions and expresses significant remorse. Given the factors mentioned above, this examiner concludes that Mr. Paradela is in the low risk category for violence should he parole. He would most likely have little difficulty reintergrating into society . . . . Mr. Paradela recognizes that his need for acceptance led him to become involved with the criminal element and distorted his thinking. He realizes that he had 'punk kid' attitude that eventually was a factor in his commitment offense. Chief among his distorted thinking patterns was a "pay back for pay back" attitude." All right. I note for the

25
26

---

[4] The report actually says "Alcohol Dependence, In Institutional Remission." (Resp't's Answer, Ex. 1 at p. 102.)

11

1
2
3

> record as to your parole plans, you do have at this time that you
> would plan to parole to your best friend and his wife who have
> documented their support and basically who also furnish the job
> offer that you have, and that you would definitely have marketable
> skills in welding and mill and cabinetry . . . .

4
5
6

> As to special conditions of parole, this Panel is imposing the
> following special conditions of parole: Do not use alcoholic
> beverages, submit to alcohol testing, submit the anti-narcotic
> testing, and participate in substance abuse programs, such as NA or
> AA.

7   (Resp't's Answer, Ex. 1 at p. 67-76, 78.)

8          B.      2006 Governor's Decision Reversing the Board

9          As previously stated, the Governor reversed the Board's decision. The governor may

10   review the Board's parole decision and is authorized to reverse or modify it, applying the same

11   standards as the Board. See CAL. CONST. art. V, § 8(b); Cal. Penal Code § 3041.2. Although the

12   governor undertakes an independent, *de novo* review of an inmate's suitability for parole, his

13   decision must be based on the same statutory factors and the same evidentiary record that was

14   before the Board. See In re Rosenkrantz, 29 Cal. 4th at 660-61, 128 Cal. Rptr. 2d 104, 59 P.3d

15   174. The governor has discretion to weigh the suitability factors differently than the Board and

16   may choose to be more stringent or cautious in determining whether an inmate poses an

17   unreasonable risk to public safety. See In re Shaputis, 44 Cal. 4th at 1258, 82 Cal. Rptr. 3d 213,

18   190 P.3d 573. The governor's decision must still reflect due consideration of the specified

19   factors as applied to the individual prisoner in accordance with applicable legal standards, and

20   must be supported by some evidence in the record. See In re Lawrence, 44 Cal. 4th at 1204, 82

21   Cal. Rptr. 3d 169, 190 P.3d 535.

22          After reciting a summary of Petitioner's offense, Governor Schwarzenegger's written

23   decision stated the following:

24
25
26

> When he committed this crime, Mr. Paradela was 19 years old. He
> had no prior criminal record, but according to the probation report,
> he admitted using marijuana, LSD, cocaine, and PCP prior to the
> life offense. He was also identified as a member of the Bahala Na
> Gang.

12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

I have considered various positive factors in reviewing whether Mr. Paradela is suitable for parole at this time. In addition to severing his gang ties many years ago, and remaining discipline-free during his incarceration, Mr. Paradela made efforts in prison to enhance his ability to function within the law upon release. He received a GED and a high school diploma. He completed vocational training in welding, and also in mill and cabinet work. He held institutional jobs such as teacher's aid and maintenance worker. He also availed himself of some self-help and therapy, including Anger Management, Honesty & Truthfulness Equals Personal Integrity, Criminals & Gang Members Anonymous, Victim's Workshop, Framework for Recovery, and the Christina 12-step Program. He maintains seemingly solid relationships and close ties with supportive family and friends, and received some positive evaluations from mental-health and correctional professionals over the years. He also says he accepts responsibility for his actions and is remorseful for the murder he committed. Regarding his plans for parole, Mr. Paradela planned to live and work with a friend in San Joaquin County, the country of last legal residence. Because the 2006 Board granted Mr. Paradela a 2009 parole-release date, and there is no way of knowing whether his housing and/or employment arrangements will remain viable at that time, his parole plans are not presently a factor weighing either in favor or against his release.

Despite the positive factors I have considered, the second-degree murder for which Mr. Paradela was convicted was extremely brutal and demonstrated an exceptionally callous disregard for human suffering when he chased and stabbed Mr. Bracamonte several times, even while Mr. Bracamonte pled for his life. According to the Court of Appeal opinion, Mr. Paradela pulled Mr. Bracamonte out of the car to fight. He punched Mr. Bracamonte and then took out a knife and stabbed him approximately three times. Mr. Bracamonte ran into a field to get away from Mr. Paradela, but Mr. Paradela chased him down and continued stabbing him. Mr. Bracamonte tried to defend himself and pled with Mr. Paradela to stop, but Mr. Paradela was unrelenting. At one point, while Mr. Bracamonte was laying on the ground on his back, he "grabbed the blade of the knife and pleaded with [Mr. Paradela] to stop stabbing him." Mr. Bracamonte even offered to give Mr. Paradela his pagers if he would stop. According to the probation report, Mr. Paradela stabbed Mr. Bracamonte 14 times, inflicting knife wounds to his head, chest, abdomen, and extremities. The gravity of the second-degree murder perpetrated by Mr. Paradela is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk. The San Joaquin County District Attorney's Office agrees, registering opposition to parole with the 2006 Board based on the gravity of the murder he committed.

In finding Mr. Paradela suitable for parole, the 2006 Board stated

13

1
2
3
4

that "the offense was committed as a result of significant stress in [Mr. Paradela's] life," and noted that Mr. Paradela's father created "havoc" in his family and made it "difficult or impossible for [Mr. Paradela] to remain at home." Regardless of whether Mr. Paradela was under stress when he perpetrated the life offense, I believe that factor, by itself, is presently insufficient to mitigate the nature and circumstances of the murder he committed.

5
6
7
8
9
10
11
12

Mr. Paradela admitted to the probation officer that he began drinking alcohol at a young age, and he was drinking the day of the murder. Mr. Paradela's 2005 mental-health evaluator diagnosed him with "Alcohol Dependence, In Institutional Remission," and concluded that "Mr. Paradela would benefit from continued participation in the Christian 12-step group." In addition, at his 2006 hearing, Mr. Paradela told the Board that his "anger issues" are "something that [he] continually need[s] to address through groups" and that "self image is something that [he] need[s] to continue to work on." Nevertheless, Mr. Paradela told the 2006 Board that he recently "decided to take a break" from all self-help and therapy programs. In light of Mr. Paradela's self-identified needs, and the comments of his most recent mental-health evaluator, I agree that Mr. Paradela would benefit from further self-help and therapy.

13
14
15
16
17
18
19

The 2006 Board granted Mr. Paradela a 2009 parole-release date, at which time he will have served slightly more than 15 of his 15 years to life sentence. At the 2006 hearing, the Board found that he has a reduced probability for recidivism due partially to his "advanced age." Mr. Paradela is currently 32 years old. Nonetheless, given the current record before me, and after carefully considering the very same factors the Board must consider, I find that the gravity of the murder perpetrated by Mr. Paradela presently outweighs the positive factors. Accordingly, because I believe his release would pose an unreasonable risk of danger to society, I REVERSE the Board's 2006 decision to grant parole to Mr. Paradela.

20  (Resp't's Answer, Ex. 1 at p. 84-86.)

21      C.    Superior Court Decision

22  On state habeas corpus review, the San Joaquin County Superior Court denied

23  Petitioner's request for a writ of habeas corpus. The court explained that the Governor found

24  that the commitment crime "was especially brutal" and that the Petitioner "demonstrated an

25  exceptionally callous disregard for human suffering when he chased and stabbed [the victim]

26  several times, even when [the victim] pled for his life." (Id. at p. 2.) After noting that the

14

1   Governor's decision recited the facts of the crime in detail, the court also specifically quoted the

2   Governor's comments that:

> Mr. Paradela admitted to the probation officer that he began
> drinking alcohol at a young age, and he was drinking the day of the
> murder. Mr. Paradela's 2005 mental-health evaluator diagnosed
> him with "Alcohol Dependence, In Institutional Remission," and
> concluded that "Mr. Paradela would benefit from continued
> participation in the Christian 12-step group." In addition, at his
> 2006 hearing, Mr. Paradela told the Board that his "anger issues"
> are "something that [he] continually need[s] to address through
> groups" and that "self image is something that [he] need[s] to
> continue to work on." Nevertheless, Mr. Paradela told the 2006
> Board that he recently "decided to take a break" from all self-help
> and therapy programs. In light of Mr. Paradela's self-identified
> needs, and the comments of his most recent mental-health
> evaluator, I agree that Mr. Paradela would benefit from further self-
> help and therapy.

11   (Id. at p. 2-3.) Subsequently, the court concluded that:

> The Governor's decision need only be supported by "some
> evidence." [In re Rosenkrantz (2002) 29 Cal.4th 616, 625, 128 Cal.
> Rptr. 2d 104, 59 P.3d 174.] "The particular circumstances of the
> commitment offense, can, by themselves, provide the 'some
> evidence' that is necessary to uphold the Governor's decision." [In
> re Lowe (2005) 130 Cal. App. 4th 1405, 1427, 31 Cal. Rptr. 3d 1,
> citing Rosenkrantz.] . . . . As was the case in Lowe, the Governor
> here has cited some evidence to support his determination. Hence,
> the petition is denied.

17   (Id. at p. 3.)

18        The state court denied Petitioner's state habeas petition finding that "the particular

19   circumstances of the commitment offense can, by themselves, provide the 'some evidence' that is

20   necessary to uphold the Governor's decision." (Id. at Ex. 1, at p. 3 (citations omitted).)

21   However, the state court also specifically cited to "some evidence" regarding Petitioner's mental

22   state that supported the inference of his current dangerousness.

23        As previously stated, the question is whether there is something in Petitioner's pre or

24   post-incarceration history or his current demeanor or mental state that supports the inference of

25   current dangerousness. See Hayward, 603 F.3d at 562. The record supports that there was

26   "some evidence" to support the inference of Petitioner's current dangerousness. As stated above,

15

1   the Governor and the state court noted that: (1) the mental health evaluator diagnosed Petitioner
2   with "Alcohol Dependence, In Institutional Remission"; (2) the mental health evaluator stated
3   that Petitioner would benefit from continued participation in the Christian 12-step group; (3)
4   Petitioner stated to the Board that his anger issues are something that he continually needs to
5   address through groups; (4) Petitioner stated to the Board that his self-image is something that he
6   continually needs to work on; and (5) Petitioner stated to the Board that he recently decided to
7   take a break from all self-help and therapy groups.

8         This cited evidence by the state court is supported in the record and creates a modicum of
9   evidence to create a nexus between Petitioner's commitment offense and his current
10  dangerousness. See In re Lawrence, 44 Cal. 4th at 1226, 82 Cal. Rptr. 3d 169, 190 P.3d 535
11  (stating that the deferential standard of review requires credit to be given to the Governor's
12  findings if they are supported by a modicum of evidence). Specifically, as noted above, the
13  Petitioner admitted that he continually needs to address his "anger issues" through groups just
14  like his drug and alcohol addictions, but that he decided to take a "break" from going to all such
15  groups. Petitioner's articulated reason before the Board why he stopped going to groups was that
16  he was involved in too many groups. (Resp't's Answer, Ex. 1 at p. 36.) Later, when Petitioner
17  was asked why he had stopped going to all "programs," Petitioner could articulate no reason
18  besides the fact that he "[j]ust decided to take a break," and that instead of going to the positive
19  programs of groups, Petitioner stated that he was working out regularly, playing basketball, and
20  "just really kind of relaxing." (Id. at p. 40, 41.)

21        It is noted that the mental health advisor's 2005 clinical evaluation of Petitioner stated
22  that "Mr. Paradela would benefit from continued participation in the Christian 12-step group. He
23  does not need any mental health treatment at this time." (Resp't's Answer, Ex. 1, at p. 104.)
24  Nonetheless, the Governor concluded that Petitioner would benefit from further self-help and
25  therapy in light of Petitioner's statements to the Board regarding his mental health issues and the
26  mental health evaluator's statement that he would benefit from continued participation in a

16

1   Christian 12-step group. (Id. at Ex. 1 at p. 85.) The Governor was within his authority to resolve
2   the conflict of Petitioner's continued need for therapy in determining that he would benefit from
3   further therapy even in light of the 2005 mental health evaluator's report. See Lazor, 172 Cal.
4   App. 4th at 1198, 92 Cal. Rptr. 36 (stating that the "some evidence" standard is extremely
5   deferential and resolution of any conflicts in the evidence are within the authority of the Board);
6   see also Rosenkrantz, 29 Cal. 4th at 676-77, 128 Cal. Rptr. 2d 104, 59 P.3d 174 ("Due process of
7   law requires that [the Governor's] decision be supported by some evidence in the record. Only a
8   modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to
9   be given the evidence are matters within the authority of the Governor."). Thus, this Court will
10  not question the Governor's resolution of the conflict regarding the need for Petitioner to
11  continue therapy in light of the fact that there was evidence in the record (in the form of
12  Petitioner's own statements to the Board) that Petitioner needed groups to keep his anger issues
13  in check but that he simply had decided to take a "break" from group therapy.

14      Accordingly, under Hayward/Lawrence, there was a nexus between the commitment
15  offense and Petitioner's current dangerousness in that there was a modicum of "some evidence"
16  in the record that supported the Governor's ultimate determination that Petitioner poses a current
17  risk of danger to society such that Petitioner's constitutional rights were not violated by the
18  denial of his parole.[5]

19

20      [5] As previously stated, the proper standard by which to review the Governor's reversal of
    a parole grant is whether Petitioner poses a current risk of danger to society, not whether
21  Petitioner's commitment offense demonstrated an exceptionally callous disregard for human life.
    Thus, the state court decision may have been an unreasonable application of California's "some
22  evidence" requirement when it stated that "the particular circumstances of the commitment
    offense, can, by themselves, provide the 'some evidence that is necessary to uphold the
23  Governor's decision."

24      However, even if this court were to find that the state court's decision was an
    unreasonable application of California's "some evidence" requirement, that would not end this
25  court's habeas inquiry. See Butler v. Curry, 528 F.3d 624, 641 (9th Cir. 2008) (holding that,
    after concluding that the lower court's decision was contrary to clearly established Supreme
26  Court precedent, the Court must then make a finding as to whether the petitioner's constitutional

1

## V. CONCLUSION

2    For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that Petitioner's

3    application for writ of habeas corpus be denied.

4    These findings and recommendations are submitted to the United States District Judge

5    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days

6    after being served with these findings and recommendations, any party may file written

7    objections with the court and serve a copy on all parties. Such a document should be captioned

8    "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

9    shall be served and filed within seven days after service of the objections. The parties are

10    advised that failure to file objections within the specified time may waive the right to appeal the

11    District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991). In any objections he

12    elects to file, petitioner may address whether a certificate of appealability should issue in the

13    event he elects to file an appeal from the judgment in this case. See Rule 11, Federal Rules

14    Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

15    when it enters a final order adverse to the applicant).

16

17    DATED: September 9, 2010

18

19    TIMOTHY J BOMMER
     UNITED STATES MAGISTRATE JUDGE

20

21

22    rights have actually been violated). A federal habeas court's "power to grant the writ of habeas
     corpus to a state inmate depends on his actually being 'in custody in violation of the Constitution

23    or laws of the United States." Id. Thus, Petitioner is only entitled to habeas corpus relief if his
     due process rights were violated by the lack of "some evidence" to support the Governor's denial

24    of parole. As stated above, there was a modicum of "some evidence" in the record that created a
     nexus between Petitioner's commitment offense and his current dangerousness. Thus, even if the

25    state court unreasonably applied California's "some evidence" standard, Petitioner is not in
     custody in violation of the Constitution or the laws of the United States to warrant federal habeas

26    relief.